# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LINDA HALL | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15 C 7815 |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | Magistrate Judge Sidney I. Schenkier |
| Commissioner of the U.S. Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Linda Hall has filed a motion seeking reversal of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for a period of disability, disability insurance benefits ("DIB"), and Disabled Widow's Benefits ("DWB")[2] under Sections 216(i) and 223(d) of the Social Security Act (doc. # 18). The Commissioner has filed her own motion seeking affirmance of the decision denying benefits (docs. ## 22, 23). For the following reasons, Ms. Hall's motion is granted, and the Commissioner's motion is denied.

## I.

Ms. Hall applied for benefits on March 29, 2012, alleging she became disabled on March 22, 2012 (R. 21, 231-39). Her last insured date is December 31, 2016 (R. 20, 274). The application was denied initially on July 12, 2012, and upon reconsideration on December 12, 2012 (R. 149-52, 161-64). Ms. Hall, represented by counsel, appeared and testified before an

---

[1] On September 21, 2015, by consent of the parties, and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 7, 8).

[2] Disabled widow's benefits "are a survivor's benefit based on the widow's disability and the deceased person's insured status." *Aarestad v. Comm. of Soc. Sec.*, 450 Fed.Appx. 603, 604 n.1 (9th Cir. 2011). The administrative law judge explained that Ms. Hall was required to demonstrate the she had attained the age of fifty, was unmarried, and had become disabled before July 31, 2016 in order to qualify for DWB (R. 21).

administrative law judge ("ALJ") on November 4, 2013 (R. 41-81). A vocational expert ("VE") also testified (R. 81-91). On March 25, 2014, the ALJ issued a decision finding that Ms. Hall was not disabled and denying her claim for benefits (R. 20-34). The Appeals Council denied Ms. Hall's request for review on July 13, 2015, making the ALJ's decision the final decision of the Commissioner (R. 1-7). *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record. Part A reviews Ms. Hall's medical history, Part B reviews the hearing testimony, and Part C summarizes the ALJ's opinion.

## A.

Ms. Hall was born on October 18, 1961 and was fifty-two years old at the time of the hearing (R. 48). She left high school after her junior year and never completed a degree (*Id.*). Ms. Hall's past work includes working as a fast-food restaurant manager and as a cashier in a gas station (R. 81-82).

On October 1, 2011, Ms. Hall sought emergency treatment at Provena St. Mary's Hospital after she fell off a horse and was trampled. An x-ray showed a left-shoulder separation in the acromioclavicular ("AC") joint, but no evidence of a fracture (R. 367). She was treated with prescription pain medication and released (R. 356).

On March 21, 2012, Ms. Hall presented at Ingalls Memorial Hospital complaining of atypical chest pain (R. 473-81). She was admitted for observation but was released the next day after initial tests failed to confirm a myocardial infarction (R. 441, 486). On March 23, 2012, however, Ms. Hall again appeared at Ingalls Hospital complaining of severe chest pain. She was given intravenous heparin, an anticoagulant drug, and an electrocardiogram ("EKG") test (R. 441). Attending physician Sujith Sundararaj determined that she had experienced a non-ST

myocardial infarction – that is, a heart attack that does not show a change in the ST segment elevation in an EKG test (*Id.*). Dr. Sundararaj noted that Ms. Hall had a longstanding history of high blood pressure and diabetes, but was "notoriously noncompliant" with treatments recommended for those disorders (*Id.*). A spiral CT exam showed no evidence of an aneurysm or pulmonary embolus (R. 467). A coronary angiography showed a ninety percent stenosis of Ms. Hall's left circumflex artery, and a stent was inserted to revascularize it (R. 413, 443). She was released from the hospital on March 26, 2012 and directed to continue taking aspirin, Plavix, an unspecified beta blocker, and nitroglycerin for her heart condition (R. 443, 445).

A few weeks later on April 12, 2012, Ms. Hall's family physician Dr. R. Medavaram issued a brief assessment of her work abilities. Dr. Medavaram stated that she could only lift up to five pounds occasionally, stand or walk for less than one hour a day, and sit for less than two hours in an eight-hour workday (R. 403). Dr. Medavaram also opined that Ms. Hall could reach overhead and carry out fine and gross manipulation with her hands only occasionally (*Id.*).

Five days later on April 17, Ms. Hall appeared once more at Ingalls Hospital complaining of chest pain. Dr. Sudarararj ruled out a further heart attack and attributed the pain to a musculoskeletal origin (R. 415). Ms. Hall was released with a notation that she was currently taking aspirin, insulin and metformin for diabetes, the hypertension medication lisonopril, the beta blocker metoprolol, Lipitor, and the anticoagulant Effient (*Id.*).

On April 23, 2012, Ms. Hall completed a function report for the bureau of Disability Determination Services ("DDS") (R. 307-13). Ms. Hall described her activities of daily living ("ADL") as minimal.[3] She takes her medications after breakfast and then must take a nap to cope

---

[3] Activities of daily living are basic self-care tasks such as bathing, dressing, feeding, toileting, walking, and hygiene. Instrumental ADLs are more complex tasks associated with independent living such as cooking, cleaning, shopping, handling transportation, paying bills, using a telephone, and managing medications. *McNeill v. Astrue*, 2013 WL 86561, at *9 n.12 (E.D.N.C. Feb. 20, 2013) (citing Leslie Kernisan, M.D. & Paula Spencer Scott,

3

with the fatigue that results from them (R. 308). Ms. Hall can feed her cat and dog but is unable to walk the dog or clean the cat's litter box (*Id.*). She is able to shop for food once a week for thirty minutes, but Ms. Hall stated that she can only prepare meals such as sandwiches and microwave dishes that require five minute of work (*Id.*). Ms. Hall is able to wash dishes on some days but cannot do other household work because exertion makes her tired and gives rise to chest and leg pain (R. 309-310). She goes outside once or twice a week but only to go the grocery store (R. 311-12). Ms. Hall stated that she is able to walk one block before she needs to rest for fifteen minutes (R. 312).

On November 6, 2012, psychologist Dr. Jeffrey Karr conducted a consultative examination of Ms. Hall for DDS and issued a written report (R. 625-28). Ms. Hall described daily activities corresponding with those set out in her DDS self-report (R. 625). She told Dr. Karr that she feels overwhelmed by activities such as going to church or playing with her grandchildren (*Id.*). She also stated that she depends on her daughter to do laundry, shopping, and household chores (R. 625-26). Ms. Hall claimed that she had briefly received treatment from a mental health professional when she was twelve but otherwise had no treatment history (R. 626). Ms. Hall reported that she was depressed, worried and unable to relax (*Id.*). Dr. Karr noted that Ms. Hall did not have any apparent cognitive difficulties, showed no interpersonal discomfort, and that her affect did not demonstrate any agitation or anxiety (*Id.*). He diagnosed her as suffering from a depressive order not otherwise specified ("NOS") (R. 628).

A November 28, 2012 treatment note from Ingalls states that Ms. Hall had continued to have intermittent chest aching that was unrelated to exertion and which occurred randomly at different times during the day (R. 667). Her medication regime had expanded at that point to

---

*Activities of Daily Living: What are ADLs and IADLs?*, http://www.caring.com/articles/activities-of-daily-living-what-are-adls-and-iadls).

include amitriptyline, clopidogrel, fluconazole, insulin, metformin, magnesium oxide for a magnesium deficiency, metoprolol, a nicotine patch, enalapril, and pantoprazole, and the statin Crestor (R. 667-68).

On December 5, 2012, Ms. Hall appeared once again at the Ingall's emergency room complaining of chest pain associated with nausea (R. 635). She was released after the pain resolved, and was urged to lose weight and continue with her medications (R. 636). The December 5 entry also noted that Ms. Hall's use of amitriptyline was designed to treat diabetic neuropathy (*Id.*). Ms. Hall had received a diagnosis of "possible neuropathy" at Stroger Hospital on July 12, 2012, when she complained of tingling in her hands (R. 604-05). An August 22 treatment entry explained that, in addition to hand tingling, Ms. Hall's blood sugar level had been poorly controlled in the past (R. 581). Insulin had first been prescribed to treat Ms. Hall's diabetes one month after the March 2012 heart attack (R. 612). Even then, her blood sugar level continued to be 255 in May 2012, 218 in July and August, and 261 in December (R. 583, 600, 613, 720). In December 2012, Ms. Hall was again diagnosed with possible diabetic neuropathy after she complained of burning in her feet (R. 719-20).

On December 5, 2012, Dr. David Gilliland completed a psychological Residual Functional Capacity ("RFC") assessment of Ms. Hall (R. 132-33). Dr. Gilliland reviewed Dr. Karr's November 2012 report, and concluded that Ms. Hall suffered from a non-severe affective disorder (R. 132). He stated that Ms. Hall's depression created only mild limitations in her ADLs, social functioning, and concentration, persistence and pace (R. 132-33). She had not experienced any episodes of decompensation (R. 133). One day later on December 6, 2012, Dr. Charles Kenney completed a physical RFC assessment of Ms. Hall that affirmed an earlier set of findings issued by state-agency expert Dr. Vidya Madala (R. 97-101,122-26). Dr. Kenney found

that Ms. Hall could lift and/or carry up to twenty pounds occasionally and ten pounds frequently; could stand and/or walk for six hours in an eight-hour workday; could sit for six hours each day; and had an unlimited ability to push and/or pull (R. 122). Dr. Kenney stated that Ms. Hall would also be able to climb stairs, ladders and scaffolds only occasionally (R. 122-23).

Ms. Hall's complaints of foot pain continued into 2013. On January 18, 2013, she told Dr. Sophia Chin that she was experiencing burning in her feet as well as recurring pain in her left shoulder and upper back (R. 713). Ms. Hall reiterated her complaints of a burning pain both in her feet and legs on March 22, 2013, during a visit to Dr. Chin (R. 719). On April 1, 2013, she told Dr. Lorraine Bangayan than she was experiencing intermittent chest pain but did not mention neuropathic discomfort (R. 750). By May 2, 2013, Ms. Hall's foot pain had improved after taking vitamin B6 (R. 697). But, during a visit on July 15, 2013, Ms. Hall complained that she was experiencing periodic pain in her hips (R. 691-92). On July 19, 2013, x-ray studies were carried out to evaluate Ms. Hall's hip and lower back pain. The hip x-ray showed mild degenerative changes in the lateral portion of the left hip, but the x-ray was otherwise normal (R. 743). The lumbar spine x-ray showed no deformities but indicated degenerative disc changes "throughout almost all of the spine," with notable changes at the L4-L5, L5-L6, and L6-S1 levels (R. 745).

Three days later on July 22, 2013, Ms. Hall was admitted to Ingalls Hospital for shortness of breath and unspecified chest pain (R. 818-26). An EKG study showed normal results, and Ms. Hall was diagnosed with "developing pneumonia" and the possible closure of a lung (R. 821). She was released after her chest pain was diagnosed as a non-cardiac event (R. 824). At a follow-up appointment on August 13, 2013, Ms. Hall denied having any shortness of breath or chest pain (R. 686). Her foot pain continued to be diminished with the use of vitamin B6, though

her A1C level was measured at 14 percent.[4] The same results applied during medical visits on September 10 and October 10, 2013 (R. 674-79, 680-83). At both appointments, Dr. Chin noted that Ms. Hall continued to experience discomfort in her hips, particularly the left hip, and that she showed a slightly antalgic gait (Id.).

On October 31, 2013, Ms. Hall told Dr. Bangayan that she had experienced chest pain two days earlier but thought that it was either the result of anxiety or acid reflux (R. 848). A cardiac perfusion scan was then performed on November 15, 2013, which produced results that were consistent with normal heart functioning without any perfusion defects (R. 833). The same was true of an adenosine stress nuclear test that was carried out on December 17, 2013 (R. 842-43). Ms. Hall reported on January 16, 2014 that she had not experienced any chest pain recently (R. 842-43).

The records for late 2013 and early 2014 do not address Ms. Hall's diabetes condition. By February 3, 2014, however, nurse practitioner Deborah Goldstein noted that Ms. Hall's diabetes had been worsening, in part, because she had failed to properly take the long-acting and short-acting insulin prescriptions that had been given to her (R. 836-38). The February entry, which is the last medical entry in the record, identifies Ms. Hall's prescription medications as Crestor, amlodipine, amitriptyline, clopidogrel, enalapril, fluconazole, hydrochlorothiazide, magnesium oxide, metformin, methocarbomal, metoprolol, nicotine patches, pantoprazole, pyridoxine, insulin, and novolin (R. 837).

**B.**

The ALJ held a hearing on November 4, 2013 (R. 41-91). Ms. Hall testified that she was fifty-two years old and had become disabled after having a heart attack in March 2012. She had

---

[4] An A1C measurement provides information about a person's average levels of blood glucose over the past three months. The A1C test is the primary test used for diabetes management. https://www.niddk.nih.gov/health-information/diabetes/diagnosis-diabetes-prediabetes/a1c-test.

earlier worked as a manager at Taco Bell, where she served food, stored frozen products, and performed routine maintenance work (R. 49). Ms. Hall explained that she had quit her job in March 2011 due to a lack of energy (*Id.*). She then took a similar job at a Circle K gas station, which she held until her March 2012 heart attack (R. 50). Ms. Hall explained that she continues to look for work and that she was given a position as a school bus driver before she failed the physical exam that was required for the position (R. 50-51). She currently lives with her sixteen year old granddaughter and two foster children (R. 46-47).

Ms. Hall testified that she returned to the hospital on three or four occasions after a stent was placed in one of her arteries in March 2012 (R. 52-53). Each visit was occasioned by chest pain, but tests showed that her discomfort was created by anxiety or other non-cardiac reasons such as low magnesium levels or acid reflux (R. 53, 55, 58). She experiences chest pain when she gets upset or when she walks for more than fifteen minutes (R. 58-59). Ms. Hall stated that she has high cholesterol, though her only symptom is fatigue caused by the medication she has to take to control her cholesterol level (R. 54). She also experiences fatigue from medication that she takes to control her blood pressure. Ms. Hall testified that after she takes her medications she feels that she is "under a cloud all day" and must nap for at least an hour (R. 71).

Ms. Hall stated that she began to experience back pain after the stent was inserted in her artery. She initially attributed her back pain to the stent, but Ms. Hall claimed that later tests showed that she suffers from arthritis (R. 51-52). Ms. Hall testified that her back pain, combined with hip pain and burning in her hands and feet from diabetic neuropathy, give rise to days when she "can barely move" (R. 73). Her hand can become numb and difficult to use up to forty percent of the time (R. 74). That makes it difficult for Ms. Hall to engage in fine manipulation like buttoning, zipping or putting on jewelry (*Id.*). On a scale of one to ten, Ms. Hall stated that

her back pain was four to five on good days but was a ten on bad days (R. 72-73). She also testified that she has arthritis in her right shoulder as well as ongoing problems in the left shoulder related to her 2011 joint separation (R. 66, 72). Ms. Hall explained that her shoulder pain makes it difficult for her to reach overhead (R. 72). She testified that even with prescription-level ibuprofen she can only stand for twenty minutes before she needs to sit for fifteen minutes (R. 70). She can only walk for one block before being required to sit for ten to fifteen minutes (R. 69). Ms. Hall stated that, as a result of her pain, she requires help from her daughter and granddaughter to carry out daily tasks, and she is no longer able to cook large meals or to climb stairs (*Id.*).

As for diabetes, Ms. Hall told the ALJ that she takes two forms of insulin three to five times daily as well as metformin (R. 59, 61). The medications make her nauseous, and taking insulin can make her feel worse than she already does from uncontrolled spikes in blood sugar (R. 60, 63). Ms. Hall stated that even with treatment her glucose levels spike from lows of sixty or seventy to a high of 600 (R. 64). As a result, she has experienced blurry vision that makes it difficult for her to drive (R. 65).

The VE also testified at the hearing, identifying Ms. Hall's past work as a Taco Bell manager as skilled work at the medium exertional level that involved the acquired skills of cashiering, cooking, and scheduling (R. 82-83). Ms. Hall's job as a convenience store cashier involved medium-level work and required the skill of cashiering (*Id.*). The ALJ then asked Mr. Malik to consider various hypothetical individuals. The first involved a person who can lift up to twenty pounds occasionally and ten pounds frequently; can sit or stand at will as long as she is not off task more than ten percent of the time; and can frequently climb, reach overhead, and use his or her hands to feel and finger (R. 83-84). The VE responded that such an individual could

not perform her past relevant work (R. 84). However, such an individual who had the transferable skills of cashiering and scheduling would be able to perform the job of a back room cashier (209,000 jobs nationally) or a cashier (249,000 jobs).

The ALJ next asked Mr. Malik to consider an individual with the same vocational profile, except that she could only perform sedentary work instead of light work. The VE responded that such a person could still carry out the jobs he had just identified (R. 86). For the third hypothetical, the ALJ asked the VE to consider someone limited to sedentary work who could frequently reach overhead but who could only occasionally use her hands to feel, handle, or finger. The VE stated that no jobs would be available for such a person (*Id.*).

**C.**

On March 25, 2014, the ALJ issued a written decision denying Ms. Hall's claim for benefits. At Step One of the sequential evaluation, the ALJ found that Ms. Hall had not engaged in substantial gainful activity since her alleged onset date of March 22, 2012 (R. 23). He also determined that she met the non-disability requirements for DWB (R. 22-23). The ALJ concluded at Step Two that Ms. Hall's severe impairments included coronary artery disease, diabetes mellitus with neuropathy, degenerative disc disease and arthritis (R. 23). Ms. Hall's depression and left-shoulder injury were found to be non-severe impairments (*Id.*). The ALJ also considered Ms. Hall's obesity and found that it was a non-severe impairment because the record failed to show that obesity gave rise to more than minimal restrictions in Ms. Hall's functioning (*Id.*). At Step Three, the ALJ found that none of these severe impairments met or medically equaled a listed impairment, either singly or in combination (R. 25-27). The ALJ specifically considered Listing 1.02 (major dysfunction of a joint), Listing 1.04 (disorders of the spine), Listing 4.04 (ischemic heart disease), and Listing 9.00 (endocrine disorders) (*Id.*).

The ALJ determined that Ms. Hall had the residual functional capacity ("RFC") to perform sedentary work as that exertional level is defined in 20 C.F.R. § 404.1567(a) as long as she was restricted to occasional climbing of ramps, stairs, ladders, ropes, or scaffolds; frequent reaching, including overhead reaching; and frequent bilateral feeling, handling and fingering (R. 27). In reaching that decision, the ALJ considered the opinions of several medical experts. The ALJ stated that Dr. Karr's consultative report showed that Ms. Hall had a mental impairment, though the ALJ did not assign any specific weight to Dr. Karr's assessment (R. 32). However, the ALJ gave great weight to Dr. Gilliland's findings that Ms. Hall's mental impairment was not severe and only created mild restrictions in her ADLs, social functioning, and ability to maintain concentration, persistence and pace (*Id.*). In support, the ALJ noted that Ms. Hall had never received any ongoing treatment for her mental impairment and that Dr. Gilliland's conclusion was consistent with the medical record as a whole (*Id.*).

The ALJ gave only partial weight to Dr. Kenney's conclusion that Ms. Hall had the physical RFC to perform light work. (R. 31). The ALJ found that Dr. Kenney's opinion was consistent with the objective record. Based on evidence submitted after the state-agency expert issued his RFC findings in December 2012, however, the ALJ found that Ms. Hall's arthritis and degenerative disc disease warranted an RFC of sedentary work with the additional restrictions in climbing, reaching, and handling stated above (R. 31-32). The ALJ gave no weight to the opinion of treating physician, Dr. Medavaram (R. 31). The ALJ reasoned that the objective tests of record did not support Dr. Medavaram's more restrictive limits on Ms. Hall's exertional capacity and that the report had been issued shortly after her March 2012 heart attack. (*Id.*).

The ALJ's RFC assessment was further based on a finding that Ms. Hall's testimony concerning the severity and frequency of her symptoms was not fully credible. The ALJ cited

Ms. Hall's ADLs at length, reasoning that activities such as feeding her cat, shopping in stores, and cooking meals were inconsistent with a claim of disability (R. 30). The ALJ disbelieved the full extent of Ms. Hall's cardiac, arthritis, and neuropathy claims based on the absence of significant abnormalities in her objective tests and the routine nature of her medical treatment (R. 31). The ALJ noted that Ms. Hall was able to sit in a chair at the hearing for almost ninety minutes and that she displayed no confusion or disorientation (*Id.*). He rejected her allegations of neuropathic deficits in her hands and feet based on the absence of any clinical evidence of such limitations in the record (*Id.*). The ALJ further concluded that the fact that Ms. Hall sought out work during her alleged disability period made her claim of disability less credible (*Id.*).

Based on the VE's testimony, the ALJ concluded at Step Four that Ms. Hall could not perform any of her past relevant work as a restaurant manager or convenience store employee (R. 32). At Step Five, the ALJ noted that the VE had identified Ms. Hall's prior work skills as cooking, cashiering and scheduling (*Id.*). The ALJ noted that the VE had testified that a person with Ms. Hall's RFC would be able to perform the tasks of a cashier or a backroom cashier, both of which were available in substantial numbers in the national economy (R. 33). Accordingly, the ALJ concluded that Ms. Hall was not disabled from March 22, 2012 through the decision date of March 25, 2014 (R. 33-34).

### III.

"We review the ALJ's decision deferentially only to determine if it is supported by substantial evidence." *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal citations and quotations omitted). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to

determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Ms. Hall argues that the ALJ made three errors that require remand. *First*, she contends that the ALJ failed to explain why the opinion of her treating physician Dr. Medavaram deserved no weight, or why the ALJ favored the report of the state-agency expert Dr. Kenney by giving it partial weight. *Second*, she contends that, for a variety of reasons, substantial evidence does not support the ALJ's RFC analysis. *Third*, Ms. Hall claims that the ALJ failed to make necessary findings of fact concerning her transferable work skills. For the reasons stated below, we conclude that a remand is required because the ALJ failed to sufficiently explain the basis for concluding that the opinion of Dr. Medavaram was entitled to no weight and the opinion of Dr. Kenney was entitled to partial weight. Because we remand on this basis, we do not reach the other grounds asserted by Plaintiff in support of remand.

### A.

An ALJ must give controlling weight to a treating physician's opinion if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). When an ALJ declines to give a treating physician's opinion controlling weight, he or she must still assign a weight to it by considering such factors as "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010); 20 C.F.R. § 404.1527(c). An ALJ must give "good reasons" for the weight

he or she gives a treating source's opinion. 20 C.F.R. § 404.1527(c)(2). An ALJ may discount the opinion of an examining physician if the ALJ adequately explains his or her reasons for doing so. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (stating that "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record").

Ms. Hall argues that the ALJ erroneously gave no weight to Dr. Medavaram's April 12, 2012 report concerning her functional capacities. The ALJ gave two primary reasons for not giving any weight to Dr. Medavaram's report. We find neither is supported by substantial evidence.

The ALJ first stated that the objective record did not support the full range of Ms. Hall's restrictions that the treating physician identified (R. 31). We agree with Ms. Hall that the ALJ's reasoning on this issue does not explain why the expert report deserved no weight. The absence of supporting medical evidence is ordinarily used to demonstrate why a treating physician's opinion is not entitled to controlling weight, not why it merits no weight at all. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means *only* that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." SSR 96-2p (emphasis added). The same Ruling instructs ALJs that when the treating source's opinion is not well-supported by the record, that opinion is "still entitled to deference and must be weighed using all of the factors" set out in the regulations stated above. SSR 96-2p; *see Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (explaining that once contradictory evidence is identified, "the treating physician's

evidence is just one more piece of evidence for the [ALJ] to weigh" by applying the regulations' criteria) (internal quotes and citation omitted).

Moreover, an ALJ must consider all of the regulatory factors when deciding the weight to assign to a treater's report. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (explaining that an ALJ must weigh a treating source's opinion by applying all of the regulatory factors); *Wallace v. Colvin*, --- F. Supp.3d ---, 2016 WL 3476702, at *5 (N.D. Ill. June 27, 2016) (noting that an ALJ must "consider *all* of the [regulatory] factors in weighing *any* medical opinion") (internal quotes and citation omitted). Here, the only regulatory factor the ALJ considered was the level of consistency between Dr. Medavaram's report and the record. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion"). The ALJ said the medical record was inconsistent with Dr. Medavaram's report because (1) the record showed "minimal evidence of significant objective abnormalities" and (2) Ms. Hall had only received conservative treatment for her impairments (R. 31). However, the ALJ never explained how that reasoning squared with the ALJ's own finding that Ms. Hall was limited to sedentary work, which "represents a significantly restricted range of work." SSR 96-2p. The ALJ never discussed how he reached that finding if there was only "minimal evidence" of serious abnormalities.

Whether Ms. Hall could lift five pounds (as Dr. Medavaram said) or ten pounds (as the ALJ said), both Dr. Medavaram and the ALJ found that she had serious exertional and non-exertional limitations. The ALJ did not explain what part of the record refuted the limitations that Dr. Medavaram found but supported those the ALJ adopted. An ALJ's reasoning must always be "sufficiently specific to make clear to any subsequent reviewers . . . the reasons for that weight" that is given to a medical source opinion (*Id.*); *see* 20 C.F.R. § 404.1527(c)(2) (stating that an

ALJ must "always give good reasons . . . for the weight [he or she] give[s] a treating source's opinion"). The ALJ's lack of specificity on this issue failed to build a logical bridge between the record and the finding that Dr. Medavaram's report deserved no weight.

The ALJ's second reason for dismissing Dr. Medavaram's report was that it was issued shortly after Ms. Hall's heart attack in March 2012, and thus did not reflect subsequent improvements in her functioning (R. 31). That reasoning falls short on two grounds.

*First*, the ALJ never explained how Ms. Hall's alleged improvements undermined Dr. Medavaram's assessments. The ALJ only cited one improvement to support his finding, noting that Ms. Hall stated on April 14, 2012 that she felt "good" and had no chest pain (R. 31). That overlooks that Ms. Hall also complained of chest pain on several later occasions, and was admitted to Ingalls Hospital in July 2013 for chest pain and shortness of breath. The ALJ noted in other parts of the decision that these later events could not be conclusively attributed to Ms. Hall's cardiac functioning (R. 28). However, the ALJ never discussed why the causes of Ms. Hall's subsequent attacks of chest pain made Dr. Medavaram's report less credible. Without doing so, it is not clear why the ALJ thought that the absence of chest pain on April 14, 2012 was sufficient to set aside Dr. Medavaram's report. *See Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011) ("The ALJ was not permitted to 'cherry-pick' from . . . results to support a denial of benefits").

*Second*, the ALJ overlooked that Dr. Medavaram did not base his opinion solely on Ms. Hall's heart attack; he also cited her low back pain and history of "NIDDM" (non-insulin dependent diabetes mellitus) (R. 404). The ALJ's opinion appears to have assumed that all of Dr. Medavaram's report was based on Ms. Hall's recent cardiac infarction. To the contrary, Dr. Medavaram evaluated an array of Ms. Hall's exertional and non-exertional limits, including her

ability to sit, stand, reach, carry out gross and fine manipulation, and feel with her hands (R. 403). The ALJ never explained why limitations in Ms. Hall's tactile sensation or even her ability to sit were caused by the heart attack, and were not complications resulting from diabetes and lower back pain. No medical expert was present at the hearing to clarify the degree to which all of Dr. Medavaram's findings were a function of Ms. Hall's heart attack. The ALJ should therefore have provided some explanation of why Dr. Medavaram's findings could be rejected as a whole without distinguishing between the varied limitations that the treater assessed. *See McMurtry v. Astrue*, 749 F. Supp.2d 875, 888 (E.D. Wis. 2010) ("A treating physician's opinion may have several points; some may be given controlling weight while others may not").

Ms. Hall's ability to use her hands was of particular importance in this regard. Dr. Medavaram said that Ms. Hall could only occasionally engage in gross and fine manipulation. The ALJ disagreed, finding that she could do so frequently. That distinction was critical because the VE testified that no work would be available to Ms. Hall if she were limited to occasional manipulation (R. 86). The ALJ never explained why the record contradicted Dr. Medavaram's finding. The ALJ did state in another part of the decision that the evidence failed to show "significant deficits in the use of [Ms. Hall's] hands" (R. 31). That suggests that Ms. Hall had few or no manipulation restrictions. Yet, by finding that Ms. Hall could engage in "frequent" fingering the ALJ necessarily found that she would be unable to use her hands up to two-thirds of the time. *See* SSR 83-10 (defining "frequently" as "from one-third to two-thirds of the time" and "occasionally" as "from very little up to one-third of the time"). The ALJ did not explain how he reached that conclusion, or what evidence led to making a distinction between "frequent" and "occasional" manipulation.

The problem is made more difficult because Ms. Hall told the ALJ that she had trouble buttoning, zipping and dressing (R. 74). She also testified that her hands go numb up to forty percent of the time and that they occasionally become "stuck" while she is combing her hair (*Id.*). The ALJ noted some of these statements but never found them lacking in credibility or explained why they supported his conclusions and refuted Dr. Medavaram's. This deficiency requires remand. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review").

Finally, we consider the ALJ's decision to give greater weight to the RFC report of the non-examining expert Dr. Kenney than to the opinion of Dr. Medavaram. Dr. Kenney opined that Ms. Hall could perform light work, meaning that she could lift up to twenty pounds occasionally; sit, stand, and/or walk for up to six hours each day; and had an unlimited ability to crawl, crouch, kneel, stoop, and balance (R. 134-35). The ALJ did not fully adopt Dr. Kenney's report, but gave it partial weight -- which was more than he gave to the report of Dr. Medavaram.

Greater weight is ordinarily given to the opinion of an examining source like Dr. Medavaram than to a non-examining source like Dr. Kenney. *See Gudgel*, 345 F.3d at 470. An ALJ can favor a non-examining source over a treating source when the ALJ properly explains why the record supports such a conclusion. The ALJ did not do so in this case. The ALJ's only explanation for preferring Dr. Kenney over Dr. Medavaram was that Dr. Kenney was familiar with the regulations, and his report was "consistent with the objective medical record" (R. 31). However, the ALJ's RFC of sedentary work rejected all of the exertional capacity findings that Dr. Kenney made. The ALJ based his disagreement with Dr. Kenney on "new and material evidence of additional impairments" that he found to support the RFC of sedentary work (R. 31-

18

32). Perhaps the ALJ meant that Dr. Kenney's report was supported by the record that was available prior to this new evidence, but that the later documents showed that Ms. Hall could only perform sedentary work. If so, the problem with that is that the ALJ never identified the "new and material" medical evidence he used to set aside Dr. Kenney's RFC. The ALJ said it concerned arthritis and disc disease, suggesting that he may have intended to reference x-rays taken in July 2013 showing that Ms. Hall had degenerative changes in her lift hip and in the L1-L2, L3-L4, L4-L5, L5-L6, and L6-S1 spinal discs (R. 743, 745). However, the basis of the ALJ's reasoning remains unclear because the ALJ never identified these records, or any other arthritis-related evidence in the decision. The same evidentiary gap applies to the ALJ's agreement with Dr. Kenney that Ms. Hall had no limitations in her ability to stoop, kneel, crouch, or crawl (R. 27, 135). The ALJ never addressed how the record showed how Ms. Hall could carry out these postural activities if she had degenerative problems in her hips and throughout the lumbar spine.

On remand, therefore, the ALJ should further consider the weight to be given to Medavaram's report and to the RFC of Dr. Kenney, and provide the required logical bridge to support whatever conclusions he might reach.

## CONCLUSION

For the reasons stated above, we grant Ms. Hall's motion for summary judgment (doc. #18) and deny the Commissioner's motion for summary judgment (doc. #22). This case is terminated.

ENTER

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**DATE:  December 13, 2016**